## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SEIFUDDIN MU'MIN, | : |
| | :    CIVIL ACTION |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ALLSTATE PROPERTY AND | :    NO.   10-7006 |
| CASUALTY INSURANCE COMPANY | : |
| | : |
| Defendant. | : |

### MEMORANDUM

BUCKWALTER, S.J.                                                          August 17, 2011

Currently pending before the Court is the Motion of Plaintiff Seifuddin Mu'Min for

Partial Summary Judgment and the Cross-motion for Summary Judgment of Defendant Allstate

Property and Casualty Insurance Company. For the following reasons, Plaintiff's Motion is

denied, Defendant's Motion is granted, and judgment on the entirety of Plaintiff's Complaint is

entered in favor of Defendant.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Issuance of the Fire Insurance Policy

On July 30, 2009, Plaintiff Seifuddin Mu'Min ("Plaintiff" or "Mu'Min") submitted an

application for homeowner's insurance with Defendant Allstate Property and Casualty Insurance

Company ("Defendant" or "Allstate"), for the premises located at 5013 Germantown Avenue,

Philadelphia, PA, 19144 (the "Property" or the "Insured Property"). (Pl.'s Mot. Summ. J., Ex.

D.) The application was taken by Gabriel A. Trevino, a licensed agent of Allstate at the John

Melvin Agency. (Id.; Pl.'s Mot. Summ. J. ¶ 8; Def.'s Resp. Mot. Summ. J. ¶ 8.) According to

Mr. Trevino, Plaintiff informed him that he had just purchased the Property, did not live at the Property at that time, but was doing a little bit of work to it and intended to move in within the next few weeks.  (Pl.'s Mot. Summ. J., Ex. E, Dep. of Gabriel Trevino ("Trevino Dep."), 60:1-13, 95:19-96:1, June 8, 2011.)  Plaintiff's application also indicated that this was his primary residence.  (Pl.'s Mot. Summ. J., Ex. D.)

In consideration for a premium paid by Plaintiff to Defendant, Defendant issued to Plaintiff an insurance policy – Allstate Policy No. 928487347 07/31 (the "Policy")   which provided standard homeowners insurance coverage for the Property located at 5013 Germantown Avenue, Philadelphia, PA 19144-5963.  (Def.'s Mot. Summ. J., Ex. E.)  The Policy became effective as of July 31, 2009.  (Id.)

### B.    The Fires at the Insured Property

Plaintiff subsequently reported two fires at the Insured Property.  The first occurred on August 12, 2009, less than two weeks after the Policy effective date, and the second occurred on September 23, 2009.  (Pl.'s Mot. Summ. J. ¶ 11; Def.'s Resp. Opp'n Mot. Summ. J. ¶ 11.)  The fires caused significant damage to the Insured Property.  (Pl.'s Mot. Summ. J. ¶ 12; Def.'s Resp. Opp'n Mot. Summ. J. ¶ 12.)  An accounting received from Citizens Public Adjusters revealed a total of $183,058.77 in damages.  (Pl.'s Mot. Summ. J., Ex. G.)  At the time the fire losses occurred, the Policy was in full force and effect.  (Pl.'s Mot. Summ. J. ¶ 13 & Ex. F; Def.'s Resp. Opp'n Mot. Summ. J. ¶ 13.)

Upon submission of a claim for the first fire on August 12, 2009, Defendant assigned adjuster Larry Hufford to the matter and retained fire investigator John Frye of Patrick McGinley and Associates.  (Def.'s Mot. Summ. J., Ex. L, ¶¶ 1, 5.)  Defendant also retained Cloud, Feehery

& Richter, Inc. – represented by Joseph Nangle – to conduct an investigation of the claim. (Pl.'s Mot. Summ. J. ¶ 14; Def.'s Mot. Summ. J. ¶ 14.) The investigations by these various individuals later incorporated the second fire that occurred at the Insured Property on September 23, 2009. (Id.; Pl.'s Mot. Summ. J., Ex. I, Dep. of Joseph F. Nangle ("Nangle Dep."), 8:6-21, May 24, 2011; Def.'s Mot. Summ. J., Ex. L ¶ 1.)

On October 15, 2009, Mr. Nangle conducted a recorded interview of Plaintiff, who averred that he was staying at the Insured Property a couple of nights a week, but on all other nights, he lived at another property owned by him at 232 Lindley Avenue in Philadelphia. (Pl.'s Mot. Summ. J., Ex. H; Def.'s Mot. Summ. J., Ex. M-4.) Plaintiff further indicated that he purchased the Insured Property from one Sam Rosemond for $27,000 cash, although the Quit-Claim deed supplied by the public adjuster showed that the transfer was between Tonya Rosemond (Sam Rosemond's wife) and Plaintiff, with consideration of one silver dollar. (Id.) Plaintiff remarked that he had had three prior fire insurance claims on two other of his properties. (Id.) With respect to the current Property, Plaintiff stated that others, including Sam Rosemond, were still living in the building rent free after he purchased the Property. (Id.)

The report from A. John Fry, dated November 13, 2009, discussed the suspected cause of the fire. (Def.'s Mot. Summ. J., Ex. N.) Burn pattern analysis disclosed that the September 23, 2009 fire originated in the second floor living room of the apartment. (Id.) More detailed examination revealed multiple points of origin, leaving Mr. Fry to opine that the fire was incendiary in nature and was caused by the intentional application of an open flame to the sofa in the second floor apartment. (Id.)

On March 3, 2010, Allstate denied Plaintiff's claim for both fires. The denial letter

3

stated, in pertinent part, as follows:

You are the named insured for policy 928487347, an Allstate Property and Casualty Insurance Company Homeowners Policy ("Policy"), which insures the Property. The investigation included many aspects, including but not limited to, inspection of the property by Allstate representatives, investigation of records, interviews related to the Property and residents at the Property, information that you provided to Allstate, including but not limited to a recorded statement taken October 15, 2009, your Examination Under Oath taken Friday, February 5, 2010. All of the information, along with the documentation supplied by yourself and/or your agents was reviewed to make a coverage determination.

Based on its investigation, Allstate denies coverage under the Policy for both losses. The investigation conducted by Allstate has determined that the fire damage, reported to have occurred August 12th and September 23rd of 2009 to the Property located at 5013 Germantown Avenue, Philadelphia, Pennsylvania 19085 is not covered under the terms, conditions and exclusions of the Policy. The investigation conducted by Allstate has determined that you did not reside at the property located at 5013 Germantown Avenue, Philadelphia, Pennsylvania 19085 and you and/or agents made misrepresentations of material facts relevant to the claims.

The denial of coverage is based on the following Policy language:

**Definitions Used In This Policy**
Throughout this policy, when the following words appear in bold type, they are defined as follows:

7.      **"Residence Premises" – means the dwelling and other structures and land located at the address stated on the Policy Declarations.**

. . .

12.     **"Dwelling" – means the single family building structure identified as the insured property on the Policy Declarations, where you reside and which is principally used as a private residence.**

**Policy, pg. 3.**

**Coverage A – Dwelling Protection**

**Property We Cover Under Coverage A**
1.      **Your dwelling** including attached structures . . .

4

Policy, page 6.

. . .

**Misrepresentation, Fraud or Concealment**

. . .

**We do not cover any loss or occurrence in which any insured person has concealed or misrepresented any material fact or circumstance.**

**Policy, page 5.**

(Pl.'s Mot. Summ. J., Ex. J (emphasis in original).)  In short, Defendant maintained two bases for the denial of coverage: (1) the policy condition of residency; and (2) misrepresentations in the claim investigation through the statement and through Plaintiff's examination under oath.  (Def.'s Resp. Opp'n Pl.'s Mot. Summ. J., Ex. G, Dep. of Brandan Barrett ("Barrett Dep.") 18, 20-21, May 24, 2011.)

### C.   **Plaintiff's Bankruptcy Proceeding**

On February 1, 2010, Plaintiff filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Eastern District of Pennsylvania. (Def.'s Mot. Summ. J., Ex. P.)  In connection with this Bankruptcy Petition, Plaintiff filed an "Application For Waiver Of The Chapter 7 Filing Fee For Individuals Who Cannot Pay The Filing Fee in Full Or In Installments" ("Application").  (Def.'s Mot. Summ. J., Ex. Q.)  Plaintiff listed 232 Lindley Avenue, Philadelphia, PA as the only asset owned by him.  (Id.)  When asked about any "person, business, organization, or governmental unit" that owed him money, Plaintiff responded, "None."  (Id.)  On Schedule A to his Bankruptcy Petition, concerning real property, Plaintiff was asked to "list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a co-tenant, community property, or which the debtor has a life estate."  (Def.'s Mot.

5

Summ. J., Ex. R-1.) In response, Plaintiff identified only a "[t]hree bedroom House At 232 Lindley Avenue, Philadelphia, PA 19120." (Id.) With respect to Schedule B of his Bankruptcy Petition, Plaintiff was asked to identify "Interests in insurance polices," but listed "None." (Id. Ex. R-2.) As to the Statement of Financial Affairs attached to Plaintiff's Bankruptcy Petition, Plaintiff was asked to identify "all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case**." (Id. Ex. R-3 (emphasis in original).) Again, Plaintiff checked off the box for "None." (Id.) That same document also sought all premises which he had occupied during the three years immediately preceding the commencement of the case if he had lived at an address other than the one listed on his Petition, but Plaintiff again identified "None." (Id. Ex. R-3.) Ultimately, on May 11, 2010, Plaintiff's Bankruptcy Petition was dismissed due to Plaintiff's "fail[ure] to attend the hearing mandated under 11 U.S.C. Sec.341 and [failure] to attend the hearing to explain [his] absence at the Sec. 341 hearing." (Id. Ex. R-4.)

## D.  Procedural History

On November 6, 2010, Plaintiff initiated the present action by filing a Complaint in the Philadelphia County Court of Common Pleas consisting of two counts: breach of contract (Count I) and bad faith (Count II). (Pl.'s Mot. Summ. J. ¶ 1 & Ex. A ("Compl.").) Specifically, Count I alleged that Defendant breached its policy of insurance by failing to pay proceeds due and owing to Plaintiff. (Compl. ¶¶ 13-18.) Count II asserted that Defendant wrongfully and in bad faith withheld payment under the Policy without a reasonable basis. (Id. ¶¶ 19-24.) Defendant removed this matter to federal court, (Pl.'s Mot. Summ. J. ¶ 2; Def.'s Resp. Opp'n Mot. Summ. J. ¶ 2), and thereafter filed an Answer with Affirmative Defenses and Counterclaim. (Pl.'s Mot.

6

Summ. J. ¶ 4 & Ex. B ("Ans. & Countercl.").) The Counterclaim contended that Plaintiff and/or

his representatives knowingly, and with intent to commit insurance fraud and defraud Defendant

Allstate, presented claims containing false, incomplete and/or misleading information concerning

facts and things relevant to the claims. (Ans. & Countercl. ¶¶ 46-53.) Plaintiff subsequently

replied to Defendant's Counterclaim on March 15, 2011.[1]  (Pl.'s Mot. Summ. J. ¶ 6 & Ex. C.)

On June 29, 2011, Plaintiff filed the present Motion for Partial Summary Judgment as to

Count I of the Complaint.  Defendant responded on July 20, 2011.  In addition, on July 1, 2011,

Defendant filed its own Motion for Summary Judgment either in part or on the entirety of the

Complaint, Plaintiff responded on July 22, 2011, and Defendant submitted a Reply Brief on July

27, 2011.  Both Motions are now ripe for this Court's consideration.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  A factual dispute is

"material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv.

Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  It is not the court's role to weigh the

---

[1]  In the interim, a default judgment was entered against Plaintiff and then reopened by this Court.
(Id.)

7

disputed evidence and decide which is more probative, or to make credibility determinations.

Boyle v. Cnty of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts.,

Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must

consider the evidence, and all reasonable inferences which may be drawn from it, in the light

most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the

evidence presented by both sides, the court must accept as true the allegations of the non-moving

party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact,

it need not "support its motion with affidavits or other similar materials negating the opponent's

claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing

out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at

325. Once the movant has carried its initial burden, the opposing party "must do more than

simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475

U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot

rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley

Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex,

477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant

will not be adequate to support a denial of a motion for summary judgment; there must be

enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson,
477 U.S. at 249-50.

Notably, "[t]he rule is no different where there are cross-motions for summary judgment."
Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Third
Circuit, "[c]ross-motions are no more than a claim by each side that it alone is entitled to
summary judgment, and the making of such inherently contradictory claims does not constitute
an agreement that if one is rejected the other is necessarily justified or that the losing party
waives judicial consideration and determination of whether genuine issues of material fact exist."
Id. (quoting Rains v. Cascade Indus., Inc., 401 F.2d 241, 245 (3d Cir. 1968)).

## III. DISCUSSION

As noted above, both parties in the present action move for at least partial summary
judgment on Plaintiff's Complaint. Because many of their arguments necessarily overlap, the
Court discusses both Motions jointly.

### A. Judicial Estoppel

Defendant first argues that the doctrine of judicial estoppel bars Plaintiff's claims in their
entirety. Specifically, Defendant contends that Plaintiff asserted, in a prior bankruptcy
proceeding, that: (1) he had no property interest in the Policy or its proceeds, and he only owned
one property, which is not the Insured Property that is the subject of this lawsuit; (2) he did not
suffer any losses within a year prior to his filing for Chapter 7 Bankruptcy; and (3) he did not
have any contingent asset of a potential damage award from Defendant. In light of such prior
representations, Defendant asserts that Plaintiff must be judicially estopped from profiting from
any contrary representations made in this case.

9

Judicial estoppel is a judicially-created doctrine, which "polices a litigant's use of the judicial system insofar as 'a plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention.'" Ortlieb v. Hudson Bank, 312 F. Supp. 2d 705, 710 (E.D. Pa. 2004) (quoting Scarano v. Cent. R.R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953)), aff'd, 128 Fed. Appx. 214 (3d Cir. 2005). The basic principle underlying the doctrine is that "absent a sufficient explanation, a party should be prohibited from gaining an advantage by litigating on one theory and then subsequently seeking an additional advantage by pursuing an irreconcilably inconsistent theory." Id. (citing Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996)). The doctrine is not intended for slight inconsistencies in a litigant's position; rather it is limited to the more serious cases in order to prevent a party from "playing fast and loose with the courts." Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003) (quotation omitted). Notably, "courts in this Circuit have found it appropriate to apply the doctrine to bar claims brought by litigants who had previously acted in bad faith in concealing those claims during prior bankruptcy proceedings." Ortlieb, 312 F. Supp. 2d at 710 (citing Krystal, 337 F.3d at 319-25 (applying judicial estoppel to bar debtor plaintiff's claim against defendant creditor for violation of the automatic stay imposed by the Bankruptcy Code because plaintiff knew about the claim during the prior bankruptcy proceeding and had a motive to conceal it in the face of an affirmative duty to disclose); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419-20 (3d Cir. 1988) (invoking judicial estoppel against debtor plaintiff to bar claims for breach of contract, breach of the duty of good faith, and fraudulent

10

misrepresentation against defendant creditor because plaintiff failed to disclose those claims in
bankruptcy proceedings despite citing defendant's improper activities as the catalyst for its
bankruptcy filing); In re Okan's Foods, Inc., 217 B.R. 739, 754-56 (Bankr. E.D. Pa. 1998)
(barring plaintiff's civil rights claim against defendant because plaintiff represented the
contingent claim to the bankruptcy court as having little value and later filed a claim for
$750,000, an amount that would have satisfied all of plaintiff's outstanding debts)).

The United States Supreme Court has enumerated a set of factors to consider when
deciding whether to apply judicial estoppel to bar a party's litigation stance. New Hampshire v.
Main, 532 U.S. 742, 750-51 (2001). "First, a party's later position must be 'clearly inconsistent'
with its earlier position." Id. at 750 (quotations omitted). Second, the reviewing court must
consider whether the party "has succeeded in persuading a court to accept that party's earlier
position, so that judicial acceptance of an inconsistent position in a later proceeding would create
'the perception that either the first or the second court was misled.'" Id. (quotations omitted).
The Supreme Court has made clear that, "[a]bsent success in a prior proceeding, a party's later
inconsistent position introduces no 'risk of inconsistent court determinations' . . . and thus poses
little threat to judicial integrity." Id. at 750-51 (internal quotations and citations omitted). Third,
and finally, the court must inquire "whether the party seeking to assert an inconsistent position
would derive an unfair advantage or impose an unfair detriment on the opposing party if not
estopped." Id.

Defendant Allstate's judicial estoppel argument fails at the second element. As noted
above, the Third Circuit has held that judicial estoppel is "an extreme remedy, to be used only
when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud

11

on the court." Chao v. Roy's Constr., Inc., 517 F.3d 180, 186 n.5 (3d Cir. 2008) (internal quotation marks and quotations omitted). Thus, judicial estoppel should only be utilized "'when a party's inconsistent behavior would otherwise result in a miscarriage of justice.'" Schlegel v. Berks Area Reading Transp. Auth., No. CIV.A.01-6055, 2003 WL 21652173, at *2 (E.D. Pa. Jan. 9, 2003) (quoting Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d 779, 784 (3d Cir. 2001)). To that end, in the Third Circuit, "'judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position.'" Otos Tech. Co., Ltd. v. OGK Am., Inc., 393 Fed. Appx. 5, 8-9 (3d Cir. 2010) (quoting G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009)); see also Woods v. Borough of Lawnside, No. CIV.A.08-2914, 2009 WL 3152114, at *5 (D.N.J. Sept. 28, 2009) (holding that plaintiff's judicial estoppel argument failed because the defendant did not succeed in its prior suit in arguing that CFBL citizen group lacked standing to pursue plaintiff's claim). In so ruling, the Third Circuit has echoed the principle that because there is no risk of inconsistent court determinations in the absence of success, the notion of "success in a prior proceeding" is an "integral factor" for the application of judicial estoppel. United States v. Pelullo, 399 F.3d 197, 223 (3d Cir. 2005).

In the present case, Defendant contends that the Bankruptcy Court "accepted Mumin's filings and statements regarding his property interests and the only reason Mumin's Chapter 7 Bankruptcy was dismissed was due to Mumin's 'failure to attend the hearing mandated under 11 U.S.C. § 341 . . .'" (Def.'s Mem. Supp. Mot. Summ. J. 6.) The mere acceptance of Plaintiff's bankruptcy *filing*, however, does not translate into the court's acceptance of the legal and factual *positions* taken in conjunction with that filing. Rather, Defendant bears the burden of

12

establishing that Plaintiff "has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" New Hampshire, 532 U.S. at 750. The Bankruptcy Court had no opportunity to either accept or reject Plaintiff's statements or to rely on them in issuing a ruling, as the entire matter was dismissed three months after its filing due to Plaintiff's failure to attend the mandated hearing. Given these circumstances, this Court cannot find that the "integral factor" of "success in a prior proceeding has been met." In turn, under explicit Third Circuit precedent, judicial estoppel is inappropriate.

## B.    Breach of Contract (Count I)

The next issue – one on which both parties seek summary judgment – is Plaintiff's breach of contract claim. Specifically, Plaintiff asserts that Defendant breached the Insurance Policy by denying coverage on an unreasonably narrow interpretation of the term "reside" and an improper finding that Plaintiff engaged in misrepresentation or fraud. Defendant, on the other hand, argues that Plaintiff has failed to produce any evidence of a breach of contract.

Under Pennsylvania law, which governs interpretation of the present Insurance Policy,[2] several well-established principles control. J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 363 (3d Cir. 2004). "As a threshold matter, '[t]he task of interpreting a contract is generally performed by a court, rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument.'" Id. (quoting Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983) (citations

---

[2]   (See Def.'s Mot. Summ. J., Ex. E at 5) (indicating that Pennsylvania law applies to the Policy).)

13

omitted)). Where an insurance policy provision is ambiguous – such as where the questionable language is "reasonably susceptible of different constructions and capable of being understood in more than one sense" – it is to "be construed against the insurer and in favor of the insured. . . ." Id. (internal quotations omitted). Where the insurance policy language is clear and unambiguous, however, the court must enforce that language. Id. (citing Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (further citations omitted). Stated differently, "a court must refrain from torturing the language of a policy to create ambiguities where none exist," McMillan v. State Mut. Life Assur. Co. of Am., 922 F.2d 1073, 1075 (3d Cir. 1990), and should, wherever possible, "interpret the policy so as to avoid ambiguities and give effect to all of its provisions." Little v. MGIC Indem. Corp., 836 F.2d 789, 793 (3d Cir. 1987). "'Where the policy contains definitions for the words contained therein, the court will apply those definitions in interpreting the policy.'" J.C. Penney, 393 F.3d at 363 (quoting Monti v. Rockwood Ins. Co., 450 A.2d 24, 25 (Pa. 1982) (further citations omitted)). Ultimately, the court may not "rewrite the insurance contract, under the guise of judicial interpretation, to expand the coverage beyond that as provided in the policy." Occidental Fire & Cas. Co. of N. Carolina v. Reber Corp., No. CIV.A.04-876, 2004 WL 1529176, at *3 (E.D. Pa. June 28, 2004) (citing Guardian Life Ins. Co. v. Zerance, 479 A.2d 949, 953 (Pa. 1984)).

In the present case, Defendant denied insurance coverage under two provisions of the Policy. First, it asserted that Plaintiff failed to prove that the Property at issue was his "dwelling" and thus covered by the terms of the Policy. Second, it argued that Plaintiff made multiple misrepresentations of material fact, thereby foreclosing his entitlement to coverage under the Policy. As the Court finds that summary judgment is warranted on the first basis of denial, this

14

decision focuses solely on that portion of the parties' arguments.

The relevant provisions of the Policy dealing with the "dwelling" state:

### Definitions Used In This Policy

. . .

7.      **"Residence Premises"** – means the **dwelling,** other structures and land located at the address stated on the Policy Declarations.

       . . .

12.     **"Dwelling"**  means the single family **building structure** identified as the insured property on the Policy Declarations, where **you reside** and which is principally used as a private residence.

(Def.'s Mot. Summ. J., Ex. E at 3 (emphasis in original).)

### Coverage A – Dwelling Protection

### Property We Cover Under Coverage A

1.      **Your dwelling** including attached structures . . .

(Id. at 6 (emphasis in original).)

Given the foregoing language, neither party disputes that Plaintiff's residency at the insured premises was a condition precedent to Plaintiff's entitlement to coverage under the Policy.[3] Pursuant to Pennsylvania law, construction of the term "resident" in an insurance policy

---

[3] Indeed, Plaintiff expressly notes, in his Memorandum in support of his Motion for Summary Judgment, that "[t]he policy provides that Plaintiff was required to 'reside' at the premises." (Pl.'s Mem. Supp. Mot. Summ. J. 6.) Moreover, Pennsylvania law expressly recognizes that a provision requiring that an insured property be a "residence" constitutes a condition precedent to coverage. See Certain Underwriters at Lloyd's London, England v. Clark, No. CIV.A.97-6674, 1998 WL 404807, at *5-6 (E.D. Pa. July 16, 1998) (holding that where every clause in the contract relating to insured areas referred to the "residence premises" and the policy covered only the "residence premises," coverage was expressly conditioned on insureds residing at residence premises).

is a matter of law.[4] Nationwide Mut. Ins. Co. v. Budd-Baldwin, 947 F.2d 1098, 1100 (3d Cir.

1991); Schultz v. Encompass Ins., No. CIV.A.03-3936, 2004 WL 2075114 at *3 (E.D. Pa. Sept.

16, 2004), aff'd, 145 Fed. Appx. 397 (3d Cir. 2005). Although Pennsylvania law allows a person

to have more than one residence, St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1439

(3d Cir. 1991), Pennsylvania courts generally concur that the "classical" definition of residence

requires "[l]iving in a particular place, requiring only physical presence." Krauer v. Foremost

Ins. Co., 450 A.2d 736, 738 (Pa. Super. Ct. 1982). "A persons' intentions, whether intent to

remain in a location or intent to move on elsewhere, are irrelevant in the residency analysis."

Allstate Ins. Co. v. Naskidashvili, No. CIV.A.07-4284, 2009 WL 399793, at *3 (E.D. Pa. Feb. 16,

2009). Further, a person's own identification of the place he or she resides or calls home is not

determinative. Id. Rather, the term "resident" or "residency" requires, "'at the minimum, some

measure of permanency or habitual repetition.'" Id. (quoting Wall Rose Mut. Ins. Co. v.

Manross, 939 A.2d 958, 968 (Pa. Super. Ct. 2007)). As such, courts look at factors such as

where a person sleeps, takes meals, receives mail, and stores personal possessions. Id. In turn,

"when a person actually lives in one location, and sporadically visits, or keeps certain personal

items at, another location, it is the location where he lives that is his residence." Gardner v. State

Farm Fire & Cas. Co., 544 F.3d 553, 560 (3d Cir. 2008); see also Amica Mut. Ins. Co. v.

_____

[4] Plaintiff's Motion for Summary Judgment suggests, alheit unclearly, that the term "reside" is
ambiguous. It is well-established, however, that a definition of "dwelling" that requires that an
insured reside at that property when any loss occurs is not ambiguous. See Bell v. Allstate Ins.
Co., No. CIV.A.03-4482, 2005 WL 1353527, at *4 (E.D. Pa. May 31, 2005) ("The definition of
dwelling clearly and unambiguously requires that the property to be insured be owner occupied at
the time of any loss. Thus, as a prerequisite for coverage under this policy, an insured must
reside at that property when any loss occurs."). As such, the only inquiry is a factual one –
whether or not Plaintiff actually did reside at the insured premises.

16

Donegal Mut. Ins. Co., 545 A.2d 343, 347-48 (Pa. Super. Ct. 1988).

For example, in Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553 (3d Cir. 2008), the Third Circuit addressed what type of factual record constitutes residency. A man named Kevin Harper purchased the insured property and lived there for approximately twenty years before moving in with his girlfriend in a place around the corner. Id. at 556. To maintain the mortgage on the insured property, he rented it to the plaintiff, who remained until her eviction on February 1, 2003. Id. Meanwhile, on August 29, 2002, the plaintiff's mother slipped and fell on the sidewalk outside the property and was injured. Id. Harper had a homeowner's policy with the defendant insurer and contacted it regarding the accident. Id. Defendant denied coverage, indicating that the policy did not "offer coverage for bodily injury when the property is held for rental and is no longer occupied by the insured." Id. at 556-57. The plaintiff filed a negligence action against Harper and the defendant declined to defend. Id. After the plaintiff obtained an entry of default, Harper assigned his rights against the defendant insurance company to the plaintiff, following which plaintiff brought suit directly against the insurance company to collect on the judgment. Id. The district court granted summary judgment in favor of the defendant and the plaintiff appealed. The plaintiff argued that the insured property remained at least one of Harper's "residences" for purposes of the Policy because he "maintained a close connection with [the Property] by keeping clothing, furniture, a safe and other personal items there, keeping a key and using it to enter the [Property] frequently and without consent, receiving mail there, keeping the utility bills in his name and having the intent to return to [the Property], and actually returning there to live after [the plaintiff] left." Id. at 560. The Third Circuit found, however, that these facts were irrelevant to a determination of Harper's residence since, as "a matter of

17

physical fact," he was not living in the insured property, but rather at his girlfriend's apartment. Id. "Thus, the Property no longer qualified as an 'Insured Location' under the definition of that term in the Policy, and there was no coverage under the Policy for any bodily injury that occurred there." Id. at 560.

In the present case, there is no genuine issue of material fact as to whether Plaintiff was a "resident" of the Insured Property at 5013 Germantown Avenue. To the contrary, Plaintiff's numerous statements of record reveal that this Property was not his "residence" as defined by Pennsylvania law. In a recorded statement given to investigator Joseph Nangle, Plaintiff remarked as follows:

> Q.   Did you ever live at that property at 5013 Germantown Avenue?
> A.   I stayed there a couple nights a week.
> Q.   And what time frame was that over?
> A.   Since I owned it.
> Q.   Since April [2009]?
> A.   Yes.
> Q.   And on the other nights, where would you stay?
> A.   Lindley Avenue.

(Def.'s Mot Summ. J., Ex. F.)  Plaintiff further told the investigator that he "lived" at Lindley Avenue with his wife and two of his children, and had gone back and forth between the Lindley Avenue address and a Cherry Street, Camden, New Jersey address since 2006 – with no mention of the Insured Property as one of his residences. (Def.'s Mot. Summ. J., Ex. M-5.)  In addition, in his deposition, Plaintiff testified, as follows:

> Q.   [The application] says you moved into the residence in July of 2009; is that correct?
> A.   Yes, ma'am.

Q. But you didn't actually move into the residence, did you?

A. I was staying there all the time when I wanted to stay there.

Q. *One night a week?*

A. *Yes, ma'am. Sometimes two nights a week, you know. It wasn't no regular thing,* but I used it as a resident. Where I pray is right down the street.

Q. Your what?

A. The place you go to have prayers is like about 10 doors down the street. And I was there almost every other day so I would pray there two, three hours and I may leave two or 3:00 in the morning, whenever I felt like it, you know.

Q. Was the residence regularly unoccupied during the day? You weren't there during the day, were you?

A. No, I wasn't there during the day.

Q. It says to the question, is the residence unoccupied during the day, your answer is no. Who lived there during the day?

A. No one was there. Does that mean do I go there anytime I want to. No one lived there that I know of.

(Def.'s Mot. Summ. J., Ex. G., Dep. of Seifuddin Mu'Min ("Mu'Min Dep."), 64:23-65:22, Feb.

5, 2010 (emphasis added).)

Q. I'm going to come back to the two fires. Let me try to get some background information. If I understand correctly, you have lived at the address at 5013 Germantown Avenue and at Lindley Avenue in the past three years?

A. Yes and Cherry Street.

Q. Do you have a driver's license?

A. Yes, ma'am.

Q. What address is on your driver's license?

A. Yes, ma'am.

Q. *What address is on your driver's license?*

A. *316 Cherry Street, Camden, New Jersey.*

Q. *In August of 2009, where did you receive your mail? What address did you get your mail at?*

A. *316 Cherry and 232 Lindley Avenue.*

19

Q.    You had been in Germantown but you were not receiving mail there, were you?

A.    No, ma'am.

(Id. at 32:5-22.)

Q.    On Page Four of the application, at the top, it indicates that it was your primary residence. Unit residence, primary. This wasn't your primary residence.

A.    No, ma'am.

Q.    Do you know why it says that?

A.    I don't know. I do not know.

(Id. at 71:4-10.)

Aside from the absence of a regular or habitual presence at the Property, Plaintiff

admitted that he had not yet taken steps to move his family into the Property:

Q.    What was your intention to do with the property at Germantown Avenue? Did you intend in the future to rent it?

A.    No, to renovate it. I wanted to make it real comfortable. My family was going to move in with me because I had a problem at Lindley Avenue at the time. I had to have somewhere to go, you know.

Q.    Did you start any renovations on the property?

A.    No, ma'am . . .

(Mu'Min Dep. 66:1-9.)

Q.    Page Four says the residence will be occupied within the next 30 days. Did you plan on moving into that property within 30 days of this application?

A.    No, ma'am, because I already lived there.

Q.    Were you trying to get your family there within the next 30 days?

A.    Yes, ma'am.

. . .

Q.    When the application was signed, what steps had you already taken to

20

move your family from Lindley into Germantown Avenue?

A.    There wasn't any steps I could take. Everything was there I needed for my family. It wasn't I had to carry something in there.

. . .

Q.    *But when you bought Germantown Avenue you didn't move your family into Germantown Avenue immediately, did you?*

A.    *No, ma'am.*

(Id. at 73:18-74:12, 75:12-15 (emphasis added).)

Finally, Plaintiff admitted, and other evidence established, the Insured Property was not being used principally as a "private residence," as required by the Policy, from April 2009 to the time of the first fire. In his interview with investigator Joseph Nangle, Plaintiff testified:

Q.    Did you ever mention this [the presence of people in the insured property] after he bought the place?

A.    (adjuster) Did you say, "Sam, I need these guys out."

A.    Yes.

Q.    Did you say it since you bought the house, though?

A.    Yes sir.

Q.    And what did Sam say?

A.    He said he's gonna take care of it.

Q.    Where did you see Sam to say that?

A.    At the residence.

Q.    So he was there when you were there then?

A.    Yeah, Sam (inaudible).

Q.    How many different times did you tell him about this? How many different times, after you bought the house, did you tell him that you needed those guys out of there?

A.    (adjuster) By phone, or in person?

A.    By phone, (inaudible) come ask him, and in person (inaudible).

Q.    At the house?

A.    Yes sir.

A.    (adjuster) Do you mind if I ask a question?

Q.     No, go ahead.

A.     (adjuster) Did you put utilities into your name . . .

A.     No.

A.     (adjusters) . . . or was Sam . . . who was paying the bill for these?

A.     I don't know.  Sam was putting that in my name because (inaudible).

A.     (adjuster) So you didn't put nothing . . . There were no utilities here in your name.

A.     No sir.

A.     (adjuster) How come you didn't put them . . .

A.     Huh?

A.     (adjuster) Why didn't you put them in your name?

A.     Because people are living there for free!  You know what I mean?  I'm not (inaudible) anything!  (inaudible) but he never got them out.  Using my electric and gas for free?  I'm not gonna pay for that.

Q.     Whose name were the utilities in then?

A.     I have no idea.  It must have been Sam or his wife, one of the two.

Q.     Who was paying the utilities?

A.     I have no idea.  I know I wasn't paying them.

A.     (adjuster) Did you have an arrangement with Sam that they weren't being paid till they got out, or you weren't paying them?

A.     That was the agreement!

A.     (adjuster) He had to get them out.

A.     Them out of there, and himself.

Q.     Was Sam paying you anything?

A.     No.

(Def.'s Mot. Summ. J., Ex. F.)  Likewise, in his deposition, although Plaintiff originally indicated that the tenants vacated the Property when he bought it in 2009, (Mu'min Dep. 20:1-21), he immediately backtracked, as follows:

A.     At the time that I purchased there was two guys staying there.

Q.     But you said they vacated the property and you moved in.

A.     I was trying to get them out.

22

Q.      Let's go back then. When you purchased the property, when did you move
        in in relationship to when you made the purchase of the property? Did you
        move in that day, a week later, a month later?

A.      No. When I purchased the property, meaning when I bought it from the
        person that I bought it from, I had been staying there off and on, but the
        two guys that was staying downstairs – the person that I bought it from had
        promised to get them out and it didn't happen fast enough for me because I
        wanted to renovate the place.

(Id. at 23:10-24.) He later testified as follows:

Q.      Did you start any renovations on the property?

A.      No, ma'am. Because I was waiting on the people to move out of there. . . .

(Mu'Min Dep. 66:1-10.) On that same subject, Charles Carson, one of the "lessees"/tenants of

the Insured Property, told investigator Nangle that he resided in the Property up to the time of the

first fire. (Def.'s Mot. Summ. J., Ex. M-4.) Mr. Carson further indicated that Sam Rosemond

lived upstairs and two other men lived downstairs, but no one by the name of Seifuddin Mu'Min

resided there. (Id.)

         In short, taking all evidence in the light most favorable to Plaintiff,[5] the record is devoid

of any evidence that Plaintiff used the Property as a residence, as defined under Pennsylvania

law. Although he sporadically slept at the Property one, possibly two nights per week between

April and August 2009, he indicated that "it wasn't no regular thing," thereby admitting the

absence of permanency or habitual repetition. Plaintiff's otherwise bald representations that he

had "moved in" or "resided" at the Property are not determinative, Naskidashvili, 2009 WL

--------------------------------------------------

[5] The Court acknowledges the multitude of contradictions in Plaintiff's statements and
testimony, but makes no attempt to resolve them at this summary judgment stage. Rather, the
Court simply views the facts in the light most beneficial to Plaintiff.

399793, at *3, particularly in light of his explicit denials that he had moved personal possessions there, that his family lived there, that he received mail there, that he had a telephone number there, that he maintained any of the utilities there, or even that he was there during any daytime hours. He offered no evidence that he used the Property to take any meals, maintain any personal belongings, or shower. In addition, despite the fact that the Policy required that the Property be used "principally" as a "private residence," Plaintiff expressly admitted that tenants were occupying the Property when he bought it, and continued to occupy it even when he obtained the Policy. Plaintiff further conceded that he never started any renovations on the Property or put utilities in his name prior to the first fire because of the continued occupancy by such individuals of the Property. His mere ability to enter the Property when he desired carries little weight in the residency analysis. In light of all of this evidence, the Court finds no genuine issue contradicting a finding that the Property was not being used as private residence.

In an effort to end-run this inevitable conclusion, Plaintiff argues that coverage is warranted under Pennsylvania's reasonable expectation doctrine. According to Plaintiff, under this doctrine, "even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage." (Pl.'s Mem. Opp'n Mot. Summ. J. 10 (quoting Reliance Ins. Co. v. Moessner, 121 F.3d 895, 903 (3d Cir. 1997)).) Plaintiff goes on to argue that insurance agent Gabriel Trevino admitted to hearing Plaintiff state – at the time the Policy was issued that he did not currently live at the Property, but would within "the next couple of weeks." (Id. at 7.) Since the Policy was issued the same day, Plaintiff claims to have had a reasonable expectation that a loss occurring between June 30, 2009 and the date he moved in would be covered by the Policy provisions. (Id. at 10-11.) Because the

24

first fire occurred less than thirty days after the effective date of the insurance, Plaintiff contends that it became impossible for him to move in within this time period. (Id.)

Aside from the fact that this argument – that he did not yet reside in the Property but was intending to do so within the next thirty days – represents a complete turnaround from Plaintiff's previous assertion that he already resided in the Property,[6] it is insufficient to avoid the clear Policy provisions. "'Pennsylvania case law . . . dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured.'" Liberty Mut. Ins. Co. v. Treesdale, Inc., 418 F.3d 330, 344 (3d. Cir. 2005) (quoting Reliance, 121 F.3d at 903). "In most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations." Id. (quoting Reliance, 121 F.3d at 903). "Pennsylvania law recognizes only two limited circumstances in which the reasonable expectations doctrine may overcome the clear language of a policy: (1) to protect non-commercial insureds from policy terms which are not readily apparent; and (2) to protect noncommercial insureds from deception by insurance agents." Century Sur. Co. v. QSC Painting, Inc., No. CIV.A.08-860, 2010 WL 891245, at *8 (W.D. Pa. Mar. 8, 2010) (citing Canal Ins. Co. v. Underwriters at Lloyd's London, 435 F.3d 431, 439-40 (3d Cir. 2006)). "Inherent in both circumstances is the requirement for some action on the part of the insurer to either unreasonably obscure the terms or

---

[6] In his deposition, the following exchange occurred:

> Q.   Page Four [of the insurance application] says that the residence will be
>       occupied within the next 30 days. Did you plan on moving into that
>       property within 30 days of this application?
> A.   No, ma'am, because I already lived there.

(Mu'Min Dep. 73:18-21.)

outright deceive the insured, hence the equitable basis for relief." Id. Without evidence of such, the subjective expectations of the insured will fail to overcome the clear and unambiguous language of the policy." Id. A court must examine the totality of the insurance transaction at issue to ascertain the reasonable expectations of an insured individual. Med. Protective Co. v. Watkins, 198 F.3d 100, 106 (3d Cir. 1999). "The doctrine only applies . . . when a consumer's expectations of coverage are reasonable." Haines v. State Auto Prop. & Cas. Ins. Co., No. CIV.A.08-5715, 2010 WL 1257982, at *5 (E.D. Pa. Mar. 25, 2010), aff'd, 417 Fed. Appx. 151 (3d Cir. 2011).

Plaintiff has produced no evidence of any action by either Defendant or Mr. Trevino to obscure the terms of the Policy or outright deceive him. Quite to the contrary, any deceptive activity appears to have occurred on Plaintiff's part. According to Mr. Trevino, at the time of the application, Plaintiff told him that the house was a new purchase as of July 2009, that there were no other tenants in the house, and that he would move in within thirty days. (Trevino Dep. 68:12-18, 95:4-96:1.) The application for insurance, which was initialed and signed by Plaintiff, likewise indicated that Plaintiff purchased the Property in July 2009.[7] (Def.'s Mot. Summ. J., Ex. D at 3.) Based on this information, Mr. Trevino asked only if the Property would be occupied within the next thirty days and, when Plaintiff said "yes," Mr. Trevino issued the binder for insurance. (Trevino Dep. 36:3-37:13.) Mr. Trevino understood that Allstate's policy was to

---

[7] Plaintiff never denied making this statement to Mr. Trevino. In his deposition, the following exchange occurred:
    Q.    Did you tell the agent you purchased it [the Property] in July of 2009?
    A.    I don't know.
(Mu'Min Dep. 70:7-9.) An inability to remember does not create a genuine issue of material fact.

26

give a new homeowner up to one month to move into a property, but vacancies after thirty days were unacceptable. (Id. 38:7-14.) This was confirmed by Odette Liddle, a senior product consultant with Allstate, who indicated that "if this is a *new home* to [the applicant]," it must be occupied within thirty days. (Pl.'s Mot. Summ. J., Ex. L, Dep. of Odette Liddle ("Liddle Dep."), 22:2-18, June 8, 2011 (emphasis added).) Notably, however, all the evidence of record, including Plaintiff's own deposition, reveals that the Property was actually purchased on April 29, 2009, and the deed was recorded on May 10, 2009. (Def.'s Mot. Summ. J., Ex. H (Quit-Claim deed); Mu'Min Dep. 69:7-70:6.) As set forth in detail above, there is no evidence that Plaintiff ever resided in that Property within thirty days of that date or at the time the insurance binder was issued.

In turn, to the extent that Mr. Trevino implied that the Property would be covered by the Policy so long as Plaintiff moved in within thirty days, that statement was made based on a false representation by Plaintiff as to the purchase date of the Property and Mr. Trevino's consequent belief that the Property was just purchased. Mr. Trevino did not obscure any provision of the Policy or attempt to outright deceive Plaintiff. As such, any expectation of coverage held by Plaintiff could not have been reasonable, thereby foreclosing his reliance on the reasonable expectation doctrine.

In sum, the Court finds that no genuine issue of material fact exists as to Plaintiff's breach of contract claim. The Policy unambiguously stated that coverage of the Property was dependent on Plaintiff residing in it and using it principally as a private residence. The undisputed facts of record, however, reveal no indicia of residency, as defined under Pennsylvania law. Moreover, any expectation by Plaintiff that he had thirty days to move into

27

the Property was unfounded and did not create any right to coverage. Accordingly, the Court denies Plaintiff's Motion for Summary Judgment and grants Defendant's Motion for Summary Judgment on the breach of contract claim (Count I of the Complaint).

## C.    Bad Faith (Count II)

Count II of Plaintiff's Complaint alleges that Defendant Allstate wrongfully and in bad faith withheld payment under Policy from Plaintiff without a reasonable basis. (Compl. ¶ 20.) He goes on to cite, as examples of bad faith, the following alleged misconduct: (a) failure to make a reasonable effort to negotiate the timely settlement of Plaintiff's fire claim; (b) failing to objectively and fairly evaluate Plaintiff's claims; (c) compelling Plaintiff to institute this lawsuit to obtain policy benefits that Defendant should have paid promptly and without the necessity of litigation; (d) acting unreasonably and unfairly in response to Plaintiff's claims; (e) conducting an unfair, unreasonable, self-serving, and inadequate investigation of Plaintiff's claims; (f) placing unduly restrictive, self-serving interpretations on the policy of insurance; and (g) failing to give unbiased consideration to his claim for payment. (Id. ¶ 23.)

To establish a claim of bad faith under 42 Pa.C.S. § 8371, a plaintiff must establish that the insurer (1) lacked a reasonable basis for denying benefits and (2) knew or recklessly disregarded its lack of a reasonable basis. Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997); Toy v. Metro. Life Ins. Co., 928 A.2d 186, 193 (Pa. 2007). In the insurance context, bad faith denotes a "frivolous or unfounded" refusal to pay policy proceeds, which imports a dishonest purpose and a breach of a known duty, such as good faith and fair dealing. Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994) (quotations omitted). While mere negligence or bad judgment are insufficient, a showing of reckless

28

disregard will suffice to establish bad faith. 3039 B Street Assoc., Inc. v. Lexington Ins. Co., 740 F. Supp. 2d 671, 677 (E.D. Pa. 2010). "[I]n order to defeat a motion for summary judgment, a plaintiff must show that a jury could find by 'the stringent level of clear and convincing evidence,' that the insurer lacked a reasonable basis for its handling of the claim and that it recklessly disregarded its unreasonableness." Id. at 678 (quotations omitted).

The current bad faith claim before the Court cannot get past the initial element – lack of a reasonable basis for denying benefits. As explained in great detail above, Defendant's denial of benefits was not only reasonable, but correct under the Policy language. Absent a showing of an unreasonable denial, Plaintiff is not entitled to recover on his bad faith claim. Thus, the Court enters summary judgment in favor of Defendant on Count II of the Complaint.

## IV. CONCLUSION

In light of the foregoing, the Court finds no basis on which Plaintiff may sustain any of his causes of action against Defendant. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and judgment on the entirety of Plaintiff's Complaint is entered in favor of Defendant. This matter remains open only with respect to Defendant's Counterclaim against Plaintiff.

29